NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| L.G. & E.G. o/b/o E.G. | : | |
| Plaintiffs, | : | **Hon. Dennis M. Cavanaugh** |
| v. | : | **OPINION** |
| | : | |
| FAIR LAWN BOARD OF EDUCATION, | : | Case No. 2:09-cv-6456 (DMC) |
| | : | |
| Defendants | : | |

DENNIS M. CAVANAUGH, U.S.D.J.

This matter comes before the Court upon cross motions for summary judgment by E.G. and L.G on behalf of their daughter, E.G. ("L.")("Plaintiffs") and the Fair Lawn Board of Education ("Defendant"). Neither party requested oral argument, and pursuant to Fed. R. Civ. P. 78, no oral argument was heard. For the reasons stated herein, Defendant's motion will be **granted**.

I.   **BACKGROUND**

The child whose education is at issue in this case, L. or E.G.[1], was born on January 22, 2004. She has been diagnosed as having an autism spectrum disorder. She was referred to early intervention services when she was fifteen months old. On January 10, 2007 L. was classified as eligible for special education and related services under the category "preschool disabled." At a

---

[1] The Court has adopted the letter L. Since that is how the child is referred to in the administrative record, despite the fact that she is captioned as "E.G." on the complaint and subsequent documents.

meeting held on that same day an individualized education program ("IEP") was prepared by Defendant's child study team and L.'s mother, and was signed by L.'s mother. The IEP called for L. to attend the Stepping Stones program, the Fair Lawn district's special education program for autistic pre-schoolers. Stepping Stones employs the Applied Behavioral Analysis ("ABA") method of working with autistic children. There are other methods available such as floor play that are used in other programs such as the Children's Center of Monmouth where L. was placed prior to this litigation. In addition to ABA, L.'s IEP called for speech, occupational and physical therapy services on a weekly basis, as well as the support of a 1:1 paraprofessional throughout the day. There was also a home program which was designed to compliment the school program. On May 15, 2007 a second IEP meeting was held to plan for the upcoming school year. L.'s revised IEP included more hours of speech therapy, and increased the hours of L.'s home program. She was offered extended school year services for the summer months. Her placement at Stepping Stones was continued. Plaintiffs signed and appear to have approved of the IEP.

  As part of the Stepping Stones program, a behavioral intervention plan ("BIP") was instituted for L. that called for restraint of L. in a "basket hold" to deal with behaviors such as biting and scratching. On November 5, 2007 Plaintiffs withdrew their consent to this intervention and at that time, Plaintiffs raised the issue of changing L.'s placement to the Monmouth program. By letter dated November 15, 2007 Defendant denied this request. Plaintiffs thereafter requested an IEP meeting to further discuss their request. Plaintiffs brought several independent reports to the IEP meeting that they believed demonstrated that L. was ready for, and would benefit from, engagement with typical peers. Plaintiffs' expert, Dr. Sabatini, as well as Plaintiffs counsel, were also in attendance. Plaintiff had prepared a video to supplement the independent reports which

members of the child study team declined to view. The IEP continued to recommend Stepping Stones, and Defendant maintained, as they still do, that it provided L. with a free and appropriate public education in the least restrictive environment. Plaintiffs declined to sign the December, 2007 IEP.

Subsequent to the December, 2007 meeting, Plaintiffs decided unilaterally to remove their child from Stepping Stones and place her in the program they believed was better suited to her needs, the Children's Center. She entered that program on March 4, 2008, and Plaintiffs filed for due process with the Office of Special Education on that same day. The case was referred to the Office of Administrative Law, and an Administrative Law Judge, Judge Paone, held a seventeen day evidentiary hearing to determine if Defendants had offered L. a free and appropriate public education in the least restrictive environment. In his Opinion dated October 5, 2009, Judge Paone concluded that they had. This appeal of Judge Paone's decision in the form of cross motions for summary judgment followed.

## II. LEGAL STANDARD

### A. Standard of Review

This case comes before the Court styled as a motion for summary judgment. In fact, the instant matter is actually an appeal of the ruling by an Administrative Law Judge ("ALJ") who heard the case in a due-process hearing, and ruled in favor of Defendant in October, 2009 . Indeed, "[w]here no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record." *K.H. o/b/o K.H. v. N. Hunterdon–Voorhees Reg'l High Sch. Hunterdon Co.,* No. 05–4925, 2006 U.S. Dist. LEXIS 55522, *11, 2006 WL 2331106 (D.N.J.

3

Aug. 10, 2006) (citing *M.A. v. Voorhees Twp. Bd. of Educ.,* 202 F.Supp.2d 345, 359 (D.N.J.2002)). The standard of review in an IDEA case "differs from that governing the typical review of summary judgment." *Voorhees Twp.,* 202 F.Supp. at 359 (quoting *Heather S. by Kathy S. v. State of Wisconsin,* 125 F.3d 1045, 1052 (7th Cir.1997), aff'd, 65 Fed. Appx. 404 (3d Cir.2003)).

Title 20 U.S.C. § 1415(i)(2) vests the parties in this action with the right to bring a civil action in this Court to review the determination of the ALJ rendered in a due-process hearing under the auspices of the Office of Administrative Law. Section 1415 requires this Court to (i) receive the records of the administrative proceeding; (ii) hear additional evidence at the request of a party; and (iii) base its decision on the preponderance of the evidence, granting such relief as the Court determines appropriate. *See* 20 U.S.C. § 1415(i)(2)(C)(i)-(iii); *Shore Reg'l High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 199 (3d Cir.2004). Further, the Supreme Court has cautioned that "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982)

In reviewing the ALJ's decision this Court must apply a "modified version of *de novo* review," giving "due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.,* 435 F.3d 384, 389 (3d Cir.2006) (citing *Rowley,* 458 U.S. at 206; *Shore Reg'l,* 381 F.3d at 199; *S.H. v. State-Operated Sch. Dist. of the City of Newark,* 336 F.3d 260, 269-70 (3d Cir.2003)). The Third Circuit has instructed that "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *Shore Reg'l,* 381 F.3d at 200. Further, the Third Circuit has

explained that giving "special weight" to an ALJ's factual determinations means that this Court "must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.' " *Id.* (quoting *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 527-29 (3d Cir.1995)) (emphasis in original). "In this context, the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." *Id.* (citing *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574 (1985)). Accordingly, to overturn the ALJ's decision in this case, the Court must point to "nontestimonial evidence that undermined the testimony of these witnesses" and "provide an explanation for its decision to reject the ALJ's decision to credit" one witness over another. *Id.* (citing *S.H.,* 336 F.3d at 271).

The Supreme Court has clarified that when reviewing the ALJ's decision, the district court must bear in mind that "[t]he burden of persuasion in an administrative hearing challenging an IEP is properly placed on the party seeking relief." *Schaffer v. Weast,* 546 U.S. 49, 50 (2005). See also *L. E.,* 435 F.3d at 391 (holding that a party challenging the appropriateness of an IEP in New Jersey has the burden of proof).

"The issue of whether an IEP is appropriate is a question of fact." *State–Operated Sch. Dist. of Newark,* 336 F.3d at 271 (citing *Carlisle Area Sch.,* 62 F.3d at 526). "A federal district court reviewing the administrative fact finder in the first instance is ... required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." *G.N. v. Bd. of Educ. of Livingston,* Civ No. 05–3325, 2007 U.S. Dist. LEXIS 57081 at *15, 2007 WL 2265035 (D.N.J. Aug. 6, 2007) (quoting *State Operated Sch. Dist. of Newark,* 336 F.3d at 270). Therefore, the Court treats the ALJ's findings on the IEPs' appropriateness as prima

5

facie correct, *Bayonne Bd. of Educ.,* 602 F.3d at 564, and reviews them under a clearly erroneous standard, *Carlisle Area Sch.,* 62 F.3d at 526 (citing *Hassine v. Jeffes,* 846 F.2d 169, 174 (3d Cir.1988)). However, the Court's review over questions of law and the ALJ's application of legal precepts is plenary. *Carlisle Area Sch.,* 62 F.3d at 528, n. 3; *D.B. v. Ocean Twp. Bd. of Educ.,* 985 F.Supp. 457, 500 (D.N.J.1997); *Bucks Cty. Dept. of Mental Health/Mental Retardation v. De Mora,* 227 F.Supp.2d 426, 428 (E.D.Pa.2002). *See also Spectator Mgmt. Grp. v. N.L.R.B.,* 320 F.3d 385, 390 (3d Cir.2003); *Fotta v. Trs. of the UMW Health & Ret. Fund of 1974,* 319 F.3d 612, 615–16 (3d Cir.2003).

B.  Individuals with Disabilities Act

This case is brought pursuant to the Individuals with Disabilities Act ("IDEA"). The IDEA is a federal statute wherein Congress endeavored to "increase the personal independence and enhance the productive capacities of handicapped citizens." *Kruelle v. New Castle County Sch. Dist.,* 642 F.2d 687, 691 (3d Cir.1981). Stated generally, the IDEA provides funding to any state or local agency that demonstrates that it "has in effect a policy that assures all handicapped children the right to a free appropriate public education." *Rowley,* 458 U.S. at 180-81 (quoting 20 U.S.C. § 1412(1)). A "free appropriate public education" ("FAPE") must be "tailored to the unique needs of the handicapped child by means of an [IEP]." *Id.* (citing 20 U.S.C. § 1401(18)). Specifically, "[s]tate educational authorities must identify and evaluate disabled children, §§ 1414(a)-(c), develop an IEP for each one, § 1414(d)(2), and review every IEP at least once a year, § 1414(d)(4)." *Schaffer,* 546 U.S. at 532. Furthermore, the IDEA requires that disabled students be educated in the least restrictive environment ("LRE"), meaning "[t]o the maximum extent appropriate ... with children who are not disabled." *See L.E .,* 435 F.3d at 389 (quoting 20 U.S.C.

6

§ 1412(a)(g)(A)). "When a state fails to provide a [FAPE], it must reimburse parents for resulting private school costs." *Id.* (citing *T.R. v. Kingwood Twp. Bd. of Educ.,* 205 F.3d 572, 577 (3d Cir.2000); *Sch. Comm. of the Town of Burlington v. Dep't of Educ. of Commonwealth of Mass.,* 471 U.S. 359, 370 (1985)).

### III.  DISCUSSION

This is a case that speaks not only to the Court's obligation to apply the law, but also to its conscience. The parents who initiated this proceeding are clearly devoted, knowledgeable, and pro-active in their pursuit of the best and most appropriate education available for their child. They are to be commended for their dedication. Unfortunately, however, the IDEA does not mandate that children are entitled to the best possible education, but only to a public education that is free and appropriate, and in the least restrictive environment ("FAPE"). While on the one hand the child's IEP "must be sufficient to confer some educational benefit upon the handicapped child." *L.E. v. Ramsey Bd. of Educ.,* 435 F.3d 384, 390 (3d Cir.2006), on the other hand the state's obligation is not unlimited, nor is it required "to maximize the potential of handicapped children or provide optional level of services." *T.R. v. Kingwood Twp. Bd. of Educ.,* 205 F.3d 572, 577 (3d Cir.2000) (internal quotations omitted). The IDEA represents only a "basic floor of opportunity." *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 534 (3d Cir.1995). The IEP need only "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.' " *Id.* (citing *Chambers v. Phila. Bd. of Educ.,* 587 F.3d 176, 182 (3d Cir.2009). Moreover, the focus of the Court's inquiry is to evaluate the appropriateness of "the IEP actually offered and not one that the school board could have

provided if it had been so inclined." *Lascari,* 116 N.J.30 at 46, 560 A.2d 1180.

As much as the Court would like to honor parental choice in this matter, the evidence as adduced by the ALJ proves by a preponderance of the evidence that L. received that to which she was statutorily entitled. The parents, to their credit, wanted more for their child, and therefore rejected Defendant's placement in favor of a school they credibly believed was better suited to L's needs. They had every right to do so; that is not at issue. The only question before the Court is whether the ALJ was correct in concluding that L. was receiving a FAPE in the least restrictive environment at the time her parents made the unilateral decision to switch her to another school.

Plaintiffs contend that in their final IEP meeting with Defendant, held on December 20, 2007, the child study team had already concluded that L. would not be placed in the school of her parents' choice. Plaintiffs contend that the ALJ's failure to address what they label a procedural violation is reversible error. While the Court is troubled by the fact that the child study team seems to have predetermined that they would not transfer L. to the Monmouth school before the IEP meeting, the Court finds that this does not rise to the level of a procedural violation that would warrant reversal of the ALJ's ruling because there was meaningful, albeit unsuccessful, parental involvement.  The Court is mindful that the Supreme Court has made clear that it is  "no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process ... as it did upon the measurement of the resulting IEP against a substantive standard."*Board of Educ. v. Rowley,* 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982). In applying that standard, Judge Irenas in our district recently concluded in a similar case that "predetermination of an IEP can be grounds for finding a violation of the IDEA,

8

in particular because predetermination can serve to exclude parents from meaningfully participating in the decision making process."(see *D.B. and L.B. on behalf of H.B. v. Gloucester Township School District,* 751 F. Supp. 2d 764, 771.) The threshold question in that case, as in this one, was whether the procedural violation "(1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational benefits." N.J.A.C. § 6A:14–2. Judge Irenas found that "there were *no* discussions of this IEP with H.B.'s parents prior to the IEP meeting."(emphasis added) That was not true in the instant case. Plaintiffs had been intimately involved in every aspect of their child's education, and had participated in the formation of the original IEP that designated the Stepping Stones program as the facility at which L. would receive a FAPE, as well as a subsequent IEP meeting that ratified that placement in May, 2007. Subsequently, over a period of months, Plaintiffs changed their opinion as to the appropriate placement, and requested a change. The evidence as adduced at the hearing indicates that Plaintiffs were forthcoming about their opinion, and that the child study team listened to them and considered their request. As written in the December, 2007 IEP, "parents have submitted reports from privately provided therapies (Tomatis Method Listening Training, The Little Gym, and Oral motor therapy). The recommendations of these reports have been incorporated into the IEP as educationally appropriate." The IEP goes on to state that "the parents requested placement in an out-of-district inclusion program. The team has considered this option and rejected it as L. is benefitting from her current program and does not have the prerequisite skills to benefit from placement in an inclusion program at this time...[the team] will continue to monitor her progress to ensure she has opportunities to interact with nondisabled

9

peers when she is able to benefit from them." (R. 39, ECF Doc. 28-6). Much like the situation in *Fuhrmann on Behalf of Fuhrmann v. East Hanover Bd. of Educ*. 993 F.2d 1031, 1037 1037 (C.A.3 (N.J.),1993), another case in which the child study team made a decision adverse to the parental request, "this determination was neither unsupported nor unilateral."

    The fact that the child study team ultimately disagreed with L.'s parents does not mean that the parents were denied meaningful participation. If the standard for measuring meaningful parental participation was that the parents always prevailed, there would be no process at all. The standard must be based not on the outcome, but on the extent to which the parents were allowed to advocate for their child. In a case cited by Plaintiffs, *Spielberg by Spielberg v. Henrico County Public Schools* 853 F.2d 256, 259 (C.A.4 (Va.),1988) a denial of meaningful parental participation was found where "the defendants violated EHA procedures when they resolved to educate Jonathan Spielberg at Randolph, and then developed an IEP to carry out their decision." The facts of this case are inapposite. Defendant's refusal to change the IEP which had been previously agreed upon by the child study team and the parents is significantly different than the district in *Spielberg* where the defendant sought to unilaterally change the placement, and developed a new IEP to justify that decision. Here, where Defendant opted to continue a program that they believed to be appropriate, and which they believed provided a FAPE in the least restrictive environment, *Spielberg* is not analogous.

    The transcript is replete with testimony that explains the child study team's rationale for denying Plaintiffs' request, the team's belief that L. was not ready to be placed in a class with typical peers, and their further opinion that because it would not benefit her to be in a less restrictive environment she was actually in the least restrictive environment that was appropriate

for her functioning. The testimony also indicated that there was potential to revisit the issue as L. continued to progress in Stepping Stones, a fact that indicates that Plaintiffs' opinion had not been summarily ignored or dismissed. The testimony concerning L.'s functioning in Stepping Stones was well supported by personal observation.[2] The ALJ specifically concluded that Plaintiffs' expert was less credible than the members of the child study team who testified on behalf of Defendant, a finding based on his assessment of witness credibility that the Court is not in a position to dispute. Plaintiff's contention that the ALJ's reference to the credibility of their expert witness, Dr. Sabatini, should be discounted because they were not able to fully present their case is belied by the transcript which reveals that Dr. Sabatini testified for the better part of six days, more than any other single witness. Although the child study team did refuse to watch the video that Plaintiff brought to the December 20, 2007 meeting, the ALJ did have the opportunity to review the video, as did this Court. The video offers the Court no basis on which to conclude that but for the refusal to watch the video, the child study team's decision would have been different.

Plaintiff also claims that the ALJ committed reversible error in his decision to bifurcate the hearing to address the issue of whether L. was receiving a FAPE before considering the superiority of the Monmouth program. Plaintiffs contend that the ALJ's decision, made after Defendant had introduced much of their evidence but before Plaintiff had been similarly allowed,

---

[2]The Court notes the ironic positions that this case forced both sides into. The parents had to maintain that their child received no educational benefit from Stepping Stones, yet sought to admit evidence of her appropriate engagement with typical peers and her social progress to bolster their contention that Stepping Stones was not the least restrictive environment for L. The school district, on the other hand, had to aver that L. was flourishing and making meaningful progress in their program, yet could not allow that she might be ready for typical peer interaction.

was fundamentally unfair. In theory, the Court would agree, but having read and examined the transcript in detail, the Court finds that the ALJ gave each side ample opportunity to present and examine evidence, and that his ruling did not prejudice Plaintiff. His decision to exclude evidence of L.'s functioning subsequent to the unilateral decision to remove her from Defendant's placement was reasonable, and his parsing of the issues was legally correct. As he indicated, if Defendant could demonstrate that L. had been provided with a FAPE in the least restrictive environment, the legal inquiry was over, regardless of L.'s success in the Monmouth program, or its objective or subjective superiority for a child with L.'s needs.

Plaintiff has requested to supplement the administrative record with evidence of L.'s progress after March 3, 2008 when she left Stepping Stones. Plaintiff cites this Court's Opinion in *S.N. v. Board of Educ. of Tp. of Old Bridge* 2005 WL 1522157, 2 (D.N.J.) (D.N.J.,2005), but fails to point out language which states "furthermore, the court may consider evidence of a student's progress acquired subsequent to the development of the IEP *only* to determine 'whether the original IEP was reasonably calculated to afford some educational benefit,' because 'neither the [IDEA] nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement.'" *Susan N.,* 70 F.3d at 762 (internal quotations omitted)." While it is difficult for the Court to fathom that these loving parents would have ignored meaningful progress if there had, indeed, been some, there was ample testimony from L.'s educators and therapists as to the appropriateness, and limited success, of her placement at Stepping Stones.  As the Third Circuit held in *Fuhrmann on Behalf of Fuhrmann v. East Hanover Bd. of Educ*. 993 F.2d 1031, 1040(C.A.3 (N.J.),1993) the court cannot assess the adequacy of a student's placement "at some later date when one has the benefit of the child's

12

actual experience," but instead "must measure the adequacy of an educational program at the time it was offered to the student."  The Court accepts as fact Plaintiffs' contention that the Monmouth Child Center did indeed turn out to be a superior and more appropriate placement for L. The Court is gratified to learn that L. apparently made great strides in her new school. Further evidence that bolsters a contention that the Court already accepts would be neither "relevant, non-cumulative [nor] useful."( see *Susan N. v. Wilson School Dist.* 70 F.3d 751, 760 (C.A.3 (Pa.),1995)). Most importantly, although the Court acknowledges that this may seem to Plaintiffs to be a perverse conclusion, the fact that L. thrived in Monmouth is irrelevant to the narrow legal question that this Court, as well as the ALJ, was asked to rule on, namely whether Defendant provided L. with an IEP "reasonably calculated to enable the child to receive educational benefits."(see *Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley* 458 U.S. 176, 207, 102 S.Ct. 3034, 3051 (U.S.N.Y.,1982). Although the Court was moved by testimony from Mrs. G. that when she first took L. to the Monmouth program and watched her interact with typical peers "I saw like this little girl come alive and it gave me some hope" (25-15 p. 271, line 21), the Court finds that viewing evidence of L.'s development and progress after March 3, 2008 would not change the legal sufficiency of the ALJ's determination.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **granted.** An appropriate order follows this opinion.

                                                   S/ Dennis M. Cavanaugh
                                                   Dennis M. Cavanaugh, U.S.D.J.

Date:        June   27 , 2011
cc:           Counsel of Record
               The Honorable Joseph A. Dickson,  U.S.M.J.
               File